IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil No.: 3-16-CV-0172L |
| KENNETH W. CRUMBLEY, JR. and SEDONA OIL & GAS CORPORATION, | § § § | |
| Defendants. | § § | |

## RECEIVER'S FIRST QUARTERLY FEE APPLICATION

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Receiver Becky McGee ("Receiver") submits this First Quarterly Fee Application, respectfully stating:

### Introduction

1.     This Application is tendered pursuant to the procedures established in the Order Appointing Receiver (Dkt. 14 at pgs. 19-20, ¶¶ 41-44).

2.     The Receiver, in taking this appointment, agreed to be subject to these procedures, as well as to certain Billing Instructions.  Consistent with the appointment order and those instructions, the Receiver has previously tendered this Application for review by the Securities and Exchange Commission ("Commission"), and has addressed any concerns raised by the Commission prior to the filing of this Application.

3.     The procedures also provide that all Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  The procedures further provide that the Court may direct that the Receiver to hold back 20% of the amounts set forth in this Application pending a final application submitted at the end of the case.

### Period Covered by Application

4.      This Application seeks the Court's approval of the invoices received by the Receiver from professionals retained by her for the time period of January 21, 2016 through February 29, 2016 (the "past Quarter").[1]

### Status of Receivership

5.      The Order Appointing Receiver also provides that the Receiver is to file Quarterly Status Reports (Dkt. 14 at 17-18), which the Receiver has recently done with regard to the same period covered by this Application (Dkt. 28).  The Quarterly Status Report is designed to provide the Court with detailed information as to the status of the receivership, and the timing of its submission allows the Court to have a full report available to it in considering this Application. The Receiver would accordingly incorporate such report by reference, and encourage the Court to review that report in connection with the Court's consideration of this Application.

6.      The Receiver would specifically underscore a few points by way of overview in addition to the Quarterly Status Report:

(a)      The Receiver was appointed on January 21, 2016, and immediately, accompanied by several members of the SEC, FBI, her counsel, accountants, and ESI personnel, went to the Sedona offices located at 6060 North Central Freeway, Dallas, Texas.  In conjunction with this initial visit, the Receiver, through her counsel, sent letters to numerous banks freezing various Sedona and affiliates' bank accounts.

(b)      The Receiver was successful in freezing: (a) eighteen (18) corporate bank accounts at BBVA; (b) four (4) personal bank accounts at BBVA; (c) four (4) corporate bank

---

[1]The billing cycle of the Receiver's professionals are only being submitted through February 29, 2016, rather than through the calendar quarter of March 2016.  The same will be true for the Standardized Fund Accounting Report ("SFAR") ,attached hereto as Exhibit A, due to the fact that well and lease operating expenses lag, at a minimum, thirty (30) days behind revenue recognition and thus February 29, 2016 is the latest date in which the Receiver can report a complete financial statement containing all relevant information.  Consequently, the Receiver and her professionals are only submitting fee applications through the same date, February 29, 2016.

RECEIVER'S FIRST QUARTERLY FEE APPLICATION – Page 2

accounts at Frost Bank; and (d) various personal and corporate accounts at Citibank, American Express, TD Ameritrade and Fidelity.  The total of the funds frozen was $180,054.54.

   (c) In addition to the accounts frozen above, on or about the date of the freeze, the Receiver's counsel received a telephone call from Richard Roper, counsel to the Defendants. He informed the Receiver that he was in possession of three cashier checks totaling approximately $630,027.28 which Defendant Kenneth Crumbley ("Crumbley") had withdrawn from various personal and Sedona bank accounts.  The Receiver made arrangements to retrieve these checks, which was accomplished and they were deposited in the Receiver's bank account.

   The net effect of the funds frozen in accounts and the cashiers' checks resulted in the Receiver freezing and/or seizing approximately $810,000.00.

   (d) On or about February 9, 2016, the Receiver was notified by Michael P. Gibson, counsel for Crumbley, that Defendant Crumbley's wife, Ms. Carol Kapuranis, had on or about the date of the asset freeze, withdrawn approximately $600,000.00 in cashiers' checks from various accounts in her name, and one account in both Defendant Crumbley and her name. Mr. Gibson reported that Ms. Kapuranis had obtained separate counsel, Vic Cunningham.  Mr. Cunningham was holding slightly over $210,000.00 of these cashiers' checks.  Mr. Cunningham had deposited $290,000.00 of these cashiers' checks in his law firm's trust account.  $50,000.00 of these cashiers' checks had been deposited in Michael Gibson's law firm's trust account and $50,000.00 of the cashiers' check have been deposited in the trust account at Thompson & Knight (Richard Roper's firm).   All counsel have informed the Receiver that they will not dissipate these funds.  Ms. Kapuranis claims these funds are separate property.

   (e) Sedona also holds interests in wells operated by third parties.  In many cases, the wells are not operating profitably or not operating at all.  The Receiver is working to compile a similar accounting and initial assessment with regard to these wells, although the higher priority is to address the operational needs of the wells for which Sedona is the operator.

## DAWSON COUNTY, TEXAS

**Holder Lease** – The wells on this lease produce an average of 22 barrels of oil per day.

There are three producing wells:

- Holder #1
- Holder #2
- Holder #3

There is a fourth well, the Holder #4, but that well cannot be produced because the location does not meet Texas Railroad Commission ("RRC") requirements (it was drilled too close to the #2 and #3).  Sedona is the operator of record for these wells.

**Double Diamond Lease** – averages 8.5 barrels of oil per day and 140 mcf per day total from the following three producing wells.

- Double Diamond #1A
- Double Diamond  #2
- Double Diamond  #3

Nearby, there are also two wells on separate leases that have been temporarily abandoned:

- Triple Seven
- Ruby Red

Sedona is the operator of record for all of these wells.

## Compass Energy Wells

Compass Energy is the operator of record for the following four  Dawson County wells in which Sedona owns an interest.

- Snell Adams  (15%)      Total production averages 80 B/D
- Perry 47-1  (17%)       Total production averages 10-15 B/D
- Snell 3605 (20%)        Total production averages 8-14 B/D
- Snell 3606 (20%)         Total production averages 8-14 B/D

Compass Energy has advised that its revenue and expense records regarding Sedona's interests in these wells are being reviewed for possible corrections.  Although Compass Energy has provided some preliminary summary information, it has not yet been able to provide the Receiver with information it can confirm is correct.

In addition, on January 4, 2016 Sedona conveyed its interest in another Compass-operated well, Perry 47-2 (20.3%), to CTX Energy LLC (and Carol Kapuranis).  This well's total production averages 60-70 B/D.  CTX Energy LLC's sole member is Defendant Crumbley.

Due to the lack of hard data, and due to the lack of immediate access to operations in some instances, the Receiver has not finalized her assessment of these wells.

**Residential Real Estate**

There is a house located at 205 Highland, Lamesa, Texas.  A local broker's opinion of value was obtained.  The broker suggests a value of approximately $80,000.  This asset could be liquidated if the Court so directs.

**CONCHO COUNTY, TEXAS**

**Roy Rauch Lease**

The Roy Rauch #3 well appears to have been the well for which Sedona was most recently raising and accumulating funds for the purpose of completing the well.  The #3 well is one of two wells on the Roy Rauch lease:

- Roy Rauch #2 well – averages 55 mcf/d
- Roy Rauch #3 well – drilled but not completed.

Concho Oilfield Services and Operating Co. is the operator of record for these wells.  The Receiver is evaluating these wells and intends to advise the Court in the near future.

**HARDIN COUNTY, TEXAS**

**Hooks Lease** – averages 0.5 B/D total from the following two producing wells.

- Hooks # 2AA   71.72% WI and 1% ORRI

- Hooks #3  71.72% WI and 1% ORRI - currently not producing (operational issue)

- W.W. Cruse injection well – Sedona's ownership uncertain.

- Two additional shut-in wells.

Sedona is the operator of record for all of the wells listed above.  As a result, the same issues with documentation and accounting exist.  Compounding that, these wells have nominal production.  On the face of things, the injection well may have some value, and the Receiver intends, in the short term, to attempt to determine ownership of that well, and then to advise the Court further.

**McBride Fee Lease** – H.E.R. Operating, LLC is the operator of record for the following well in which Sedona owns an interest.

- McBride Fee well (10%) – Sedona's share of revenues is being applied to its unpaid bills.

### LaVaca County, Texas

Sedona is the operator of record on one inactive well on the Kurtz lease.  The well is listed as temporarily abandoned.  It is unlikely that there is much value in this well.

### Hidalgo County, Texas

Fordyce is the operator of record of a well in which Sedona has an interest.  However, the production is nominal and revenues are being applied to Sedona's unpaid portion of the expenses:

- Devon #2 well     total production averages 13 Mcf/d

Sedona has a 35% WI (26.25% NRI).

### Concordia Parish, Louisiana

- Quinn 5 #1 well     Shut in due to operational issues.

Sedona is operator of record.

### Cumberland County, Kentucky

**Collins (Hurd) Lease** – averages 2 1/2 B/D total from the following wells in which Sedona has a 92.5% WI (77.55% NRI):

- Collins # 3
- Collins # 6
- Collins # 8

- Collins #14
- Collins #15 (not producing due to operational issues).

Storm Resources LLC is the operator of record.  Under prevailing local crude oil prices in the area and with operating costs comparable to other wells in this area, each of these wells needs to produce more than 1 B/D to be sustainable.  The Receiver has requested operator reports from Storm in order to complete the assessment of these wells.

### OVERTON AND PICKETT COUNTIES, TENNESSEE

Sedona owns an interest in the following third-party operated wells:

### Sells Wells

- Sells #2   Shut in due to electric motor failure, uneconomic to repair and operate at current crude oil prices. Prior to shut in, produced 1-1 ½ B/D.

- Sells #3   Candidate for plugging.

- Sells #4   Shut in due to electric motor failure, uneconomic to repair and operate at current crude oil prices. Prior to shut in, produced ¼ - ½ B/D.

J3 Natural Resources is the operator of record for the Sells wells.  Given basic lease operating costs, including the $500/month/well operating fee, and the current crude oil price in the area, a well must produce more than 1 B/D to have value.  Accordingly, currently these wells appear to have nominal value.

### Jimmy Young Wells

- Jimmy Young #7  (24%)

- Jimmy Young #3  (24%)

TN Oil Co. is the operator of record.  These wells are producing and, based upon the available records, appear to have positive value.

### MISCELLANEOUS J3 WELLS

CTX Energy LLC is the owner of interests in the following producing wells operated by J3 Natural Resources until February 2016 and by Crude LLC currently.  According to the crude oil purchaser's records, CTX received a total of $32,490.94 from 6/01/13 – 12/20/15.

Overton County, Tennessee

- William Decker #1CTX       9.659% WI (7.4375% NRI) and 8.5% ORRI
- Jonathan McDonald #JM1   9.3846%WI (7.32% NRI)
- Clema Hunter #1              8.3423%WI (6.9275% NRI) and 2.46% ORRI
- Douglas Wright #1CTX       11.581% WI (8.5313% NRI) and 4.585% ORRI

Clinton County, Kentucky

- Emily Wall #2                 12.0056% WI (8.925% NRI) and 8.66% ORRI
- Warren Wallace #1 IGR      16.4059**%** WI (13.945% NRI)
- Warren Wallace #1 CTX      16.4059% WI (13.945% NRI)

Cumberland County, Kentucky

- Michael Boyles #1,1,3 & CS2  5.591% WI (4.431% NRI)

7.     The Receiver's efforts with respect to the oil and gas assets, other real estate, Sedona's assets and liabilities, the status of employees and taxes, and the status and contact information for investors was severely hampered due to Sedona's complete lack of industry standard record keeping.  To the extent there was any information regarding the oil and gas wells and/or investors, it was marginal, unorganized, and incomplete.  As a result, the Receiver and her professionals were required to expend significant time and resources in carrying out her duties as set forth in the Order Appointing Receiver.

8.     The Receiver engaged LSS&M from the outset of the case.  Based upon the allegations in the SEC complaint that the defendants were engaged in spoliation of business records, a team of experienced forensic accountants was dispatched to assist in the marshalling of estate property.  LSS&M immediately began a systematic examination of the defendant's

affairs with specific emphasis on asset identification, assessment of accounting systems and controls, with attention to record retention and preservation.

9.     The following outlines some of the work performed on behalf of the Receiver:

(a)     Assisted the Receiver in securing the office premises of Sedona including coordination of computer forensics and data preservation.

(b)     Supervised control of all posted deliveries and notifications of the receiverships and routing of mail to the Receiver.

(c)     Conducted interviews of key personnel regarding business operations with emphasis on asset identification, critical vendors, and collection of production payments due the defendant including independent accountants regarding compliance issues.

(d)     Initiated an intensive review of the defendant's computer software systems including evaluation of Roughneck and Quickbooks records and the validity and relevance of data contained therein.

(e)     Created multiple listings of well data, investor, and ownership interests.

(f)     Utilized work prepared by the SEC which required updates for more recent records obtained via search and subpoena.

(g)     Performed a detailed tracing of funds received and disbursed during the relevant period for insider non-defendants.

(h)     Maintained daily accounting of estate administration.

10.     There are a few additional miscellaneous points that are required to be included in this Application under the Billing Procedures and/or the Order Appointing Receiver:

(a)     This is the first application presented by the Receiver, and so there are no additional administrative costs in this matter.

(b)     With regards to communications with investors, the Receiver has sent notification of the Receivership to over 1,000 names located in Sedona's software tracking

system, Roughneck.  Additionally, the Receiver has established a website, providing investors with copies of relevant pleadings, and an address, telephone number and e-mail address to communicate with the Receiver.

(c)     With regard to a claims process, the Receiver does believe that a claims process will be necessary in order to distribute any funds remaining after the accumulation of cash, and sale of oil and gas and real estate assets.  The Receiver is also preparing to address creditor claims, such as Sedona's landlord and various other service providers on the oil and gas wells.

### Amount Requested

11.    The efforts described herein have caused the Receiver to incur significant administrative expenses.  For reasons set forth above and more fully below, the Receiver believes that a number of the efforts reflected in these expenses will bear fruit in the future, and further, as noted, the Receiver believes that several of the wells will produce increased revenue in the near future.  However, at the present time, these expenses are large compared to Sedona's current cash assets.  The Receiver therefore proposes a holdback of 31% of the Munsch Hardt invoices and the 20% of the LSS&M and Receiver's invoices contemplated by the Order Appointing Receiver, such that the amount sought at this time is $120,994.00 in fees and $2,685.92 in expenses for a total of $123,679.92 and the proposed holdback is $40,136.00.

12.    The Receiver further requests approval of the entire amount as reasonable and necessary and subject accordingly to payment as the assets of Sedona and the anticipated recoveries may allow and the Court may direct.  The entire amount is $163,815.92, as shown on the following chart and more specifically in Exhibit "B" hereto:

| Firm | Invoice Thru | Fees | Expenses | Totals |
|------|--------------|------|----------|--------|
| Munsch Hardt | 2/29/2016 | $72,387.50 | $2,456.80 | $74,844.30 |
| Becky McGee | 2/29/2016 | $31,800.00 | $0 | $31,800.00 |
| Litzler Segner | 2/29/2016 | $56,942.50 | $229.12 | $57,171.62 |
| | | | Total | $163,815.92 |

### Summary of Work Performed

13.     The invoices attached in Exhibit "B" have time detail entries that are consistent with the Billing Instructions, and which accordingly provide the rates charged, the time spent, a description by entry of the work performed, and also classifies the work according to certain task codes.

14.     The primary focus of the Receiver during the period covered by this report has been to implement the asset freeze, conduct an initial assessment of potentially wasting assets, develop and implement a plan to address those assets, and take the necessary steps to be able to prepare recommendations for the Court on the points laid out in the Order Appointing Receiver.

15.     Sedona Oil & Gas Corporation ("Sedona") is a small independent oil and gas operator who raised outside funds on a well-by-well project basis.  Nearly all of the funds were raised either directly from retail investors or indirectly by working with others who raise money from retail investors based upon representations formulated by Sedona.  Sedona maintains a small office at 6060 North Central Expressway that is divided in half by a door that an employee reported was generally kept closed:  one side containing an office for Crumbley, an adjacent office for a bookkeeper, a third office for a lead marketer, a fourth office for part time counsel, and a file room; and the other side containing a series of small offices with little more than a telephone, pitch sheets for wells, and lead sheets with names of prospective investors, as well as an office for the office administrator who, among other things, provided the pitch sheets and lead sheets to promoters who came and went over time.

16.     When the Receiver arrived onsite, one promoter was working the phone in an office, and the office three administrative employees were present, but the offices were otherwise deserted.   The Receiver later learned that Crumbley was going around to various banks withdrawing the working capital of Sedona in exchange for cashier's checks, which, to his credit, Crumbley's counsel independently obtained and immediately turned over to the Receiver.   A few days later, the Receiver was advised that his wife, Ms. Carol Kapuranis, had done the same with regard to additional personal accounts, obtaining cashier's checks too, some of which she provided to defense counsel as retainers.   Thankfully, her counsel likewise learned of this and took steps to ensure that these funds were not dissipated.   Altogether, it appears that this Court's entry of a freeze over preserved order $1.4 million in cash.

17.     In addition to addressing these issues, the Receiver made an initial assessment of Sedona's operational records, which the Receiver found to be incomplete and disorganized. Ordinarily, an oil and gas operator will maintain files for each well that contain original well engineering and ownership records, the documents generated during drilling, and monthly revenue and expense documentation.   This information is also usually organized by well in a computer system using one of the standard industry software packages, since as Roughneck. While Sedona has some of this documentation, and while Sedona has the Roughneck software, neither the paper files nor the Roughneck system were sufficient to allow anyone to assess the wells.   In this regard, it should be noted that the Securities and Exchange Commission ("SEC") has alleged and produced evidence showing that Sedona was raising money without actually having a reasonable basis for the projected production of a well nor for the statements as to the likely investor returns.   Before making such statements, legitimate oil and gas companies will have the type of documentation described herein.

18.     Besides looking at the records, the Receiver interviewed Sedona's employees, including Crumbley, specifically with regard to the issue of any wasting assets.   It was

immediately clear that field operations have been directed primarily by Crumbley, who addressed operational issues on an ad hoc basis using a number of contractors.

19.     As a result, the Receiver resolved that it would be necessary to speak directly with a number of the field contractors and to conduct field inspections of a number of the well sites. During the period covered by this report, this work was ongoing.

20.     Ultimately, this work produced a high-level picture of the wells and their general condition.  In the assets section, the Receiver addresses her findings in more detail.

21.     The Receiver also worked to assess the scope of potential investor claims.  In this regard, the office contains fragmentary documentation that indicates that there has been a much larger and longer practice of similar fundraising than the SEC has specifically targeted in the instant civil enforcement action.  Indeed, while the SEC has addressed representations made to 55 particular investors in six (6) offerings, the documents in the Sedona offices have names and addresses for hundreds of investors.  This presents a potential challenge for the Receiver who may hold cash or well interests that are subject to many investor claims.

22.     In addition, as the Receiver began to create well files from the bits and pieces in the Sedona offices, and then from reaching out to field contractors, oil and gas purchasers, and vendors, it quickly became clear that Sedona is also several months behind on paying many trade creditors.  On the other hand, now that the Receiver has been able to put matters in better order, it is also clear that while there are many wells that are not capable of profitable operation, there are a few that can produce positive cash flow.  A more detailed analysis is provided above.

23.     In summary, as the Receiver looks ahead, there are a number of issues as to which the Receiver will need to exercise judgment and may need to request additional relief from the Court.  In addition to the oil and gas operational issues, and the question of the appropriate scope of a claims process, there is the question of the continued requests for a carve-out for living expenses and attorneys' fees.  Accordingly, the Receiver intends to request a status conference in

order to ensure that the Receiver is exercising her discretion in a manner that is consistent with the views of the Court.

<u>**Application of Johnson Factors**</u>

24.    The primary concern in an attorney's fee case is that the fee awarded be reasonable. *Blum v. Stenson,* 465 U.S. 886, 893 (1984).  In this Circuit, the applicable test is set forth in *Johnson v. Georgia Hwy. Express, Inc*., 488 F.2d 714 (5th Cir. 1974).  Under that test, a court must first determine the loadstar amount by multiplying the reasonable number of hours billed by a reasonable billing rate. That amount can then be adjusted by various factors.

25.    The following reviews this Application with regard to each of the *Johnson* factors:

(a)    <u>The time and labor required</u>. The time and labor required are set forth in detail in the statements contained in Exhibit "B."  The Receiver invites the Court to review those statements in detail.  Further, the invoices are summarized above.

(b)    <u>The novelty and difficulty of the questions</u>.  The questions addressed by the professionals herein are common to enforcement receiverships generally, although the employee healthcare and Texas Workforce Commission issues were unique.  The level of difficulty of the issues was such that many of them required the attention of a more senior professional.

(c)    <u>The requisite skill to perform the service</u>.  The Receiver believes that the services performed in this case have required individuals possessing considerable experience in business transactions, investment fraud, oil and gas business and funds tracing.  The Receiver, her counsel, and her accountant and trustee support firm have considerable experience in these areas.

(d)     <u>The preclusion of other employment due to the acceptance of the case</u>.
The Receiver and her professionals have not declined any representation solely because of their
services as Receiver and counsel for the Receiver.

(e)     <u>The customary fee</u>. The hourly rates sought herein are at least
commensurate with the rates charged by other practitioners of similar experience levels in the
Northern District of Texas and in the case of the Receiver and her professionals.  With regard to
her counsel, the rates represent a thirty-seven percent reduction from their standard rates, which
was agreed to at the request of the Commission.

(f)     <u>Whether the fee is fixed or contingent</u>. The Receiver and her
professionals' fees are fixed insofar as monies exist by way of receivership assets from which to
pay such fees. Payment of such fees, however, is subject to Court approval, and is contingent
upon the availability of receivership assets, as evidenced by the holdback suggested by the
Receiver.

(g)     <u>Time limitations imposed by the Client or other circumstances</u>. The time
requirements during the period covered by this Application have been substantial, although they
have decreased from the emergent nature of the first few weeks of the receivership.

(h)     <u>The amount involved and the results obtained</u>.  The amount involved in
this case can be measured in a number of ways.  Obviously, there were six investment offerings
worth approximately $3.3 million having been raised, which has impacted approximately 55
investors, numerous creditors, and other parties.

(i)     <u>The experience, reputation and ability of the attorneys</u>.  Munsch Hardt is a
broad-based commercial firm with substantial experience in the handling of matters generally
related to civil trial law, dispute resolution, bankruptcy and general workout matters. The
practice of the attorneys specifically in this case regularly includes the representation of investors
and other persons involved in business transactions in which the investors or other parties are

victims or aggrieved in some fashion.  Receiver and her counsel have also participated in other large enforcement receiverships. The reputations of the Receiver and her counsel are recognized and respected in their community and area of practice.

(j)      The undesirability of the case.   The service as Receiver and the representation of the Receiver incident to this case has not been undesirable.

(k)      The nature and length of the professional relationship with the client. This is not a factor with regard to this engagement.

(l)      Award in similar cases.  The Receiver submits that the fees requested in this case are commensurate with awards approved in comparable cases in this district.

## Certification

As required by the Order Appointing Receiver, the undersigned hereby certifies that the fees and expenses incurred herein and reflected on this Application were incurred in the best interests of the Receivership Estate; and (with the exception of the Billing Instructions agreed to with the Commission) the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation to be paid or to be paid from the Receivership Estate, or any sharing thereof.  Additionally, as required by the Billing Instructions, the undersigned hereby additionally certifies that she has read this Application, that to the best of her knowledge, information and belief formed after a reasonable inquiry, the Application and all fees and expenses herein are true and accurate and comply with the Billing Instructions, that all fees contained in the Application are based on the rates listed in the Applicant's original fee schedule and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed, that she has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent such may exist in the permitted allowable amounts set forth in the Billing Instructions with regard to photocopies), and in seeking

reimbursement for a service which was justifiably purchased or contracted for a professional from a third party, she requests reimbursement only for the amount billed by and paid to the vendor and she is not making a profit on any reimbursable services provided by her.

## Conclusion

WHEREFORE, PREMISES CONSIDERED, the Receiver requests that this Court approve all of the fees and expenses as set forth herein and for such other and further relief, general and special, at law or in equity, to which the Receiver may be justly entitled.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 North Akard Street
Dallas, TX 75201-6659
(214) 740-5108
(214) 855-7584 (facsimile)
droossien@munsch.com

By: */s/ Dennis Roossien* _____
Dennis L. Roossien, Jr.
Bar No. 00784873

ATTORNEYS FOR BECKY MCGEE,
COURT APPOINTED RECEIVER

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of May, 2016, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Dennis Roossien* _____
Dennis Roossien